UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GENE D. LEWIS,

                                    Plaintiff,

          -v-

BLACKMAN PLUMBING SUPPLY L.L.C.;
ORANGE COUNTY PLUMBING GROUP,
L.L.C.; RIDGEWOOD CORP.; and JULES M.
WEINSTEIN,

                                    Defendants.

Case No. 11-CV-7046 (KMK)

OPINION AND ORDER

Appearances:

Nathaniel K. Charny, Esq.
Thomas Edward Feeney, Esq.
Charny and Associates
Rhinebeck, N.Y.
*Counsel for Plaintiff*

Douglas Evan Rowe, Esq.
Sanjay V. Nair, Esq.
Certilman, Balin, Adler & Hyman
East Meadow, N.Y.
*Counsel for Defendants Blackman Plumbing Supply L.L.C. and Orange County Plumbing
Group, L.L.C.*

Kenneth L. Moskowitz, Esq.
Brown Moskowitz & Kallen, P.C.
Summit, N.J.
*Counsel for Defendants Orange County Plumbing Group, L.L.C., Ridgewood Corp., and Jules
M. Weinstein*

KENNETH M. KARAS, District Judge:

          Plaintiff Gene Lewis filed the instant Complaint against Defendants Blackman Plumbing

Supply L.L.C.; Orange County Plumbing Group, L.L.C.; Ridgewood Corp.; and Jules M.

Weinstein, alleging multiple counts under federal and state law arising out of Plaintiff's

employment relationship with Defendants.  Before the Court is Defendants Blackman Plumbing

Supply L.L.C. and Orange County Plumbing Group, L.L.C.'s ("Defendants") Motion for

Summary Judgment.  For the following reasons, the Court grants Defendants' Motion in part and

denies it in part.

## I.  Background

### A.  Factual History

Plaintiff, currently in his sixties, was diagnosed with bone deterioration in his hip in May

2006.  (*See* Def. Blackman Plumbing's Statement of Material Facts ("Defs.' 56.1 Statement")

¶ 14 (Dkt. No. 48).)  At that time, he worked for Defendant Ridgewood Corp. ("Ridgewood")—a

commercial provider of plumbing supplies—where he was an assistant manager at Ridgewood's

Middletown, NY branch.  (*See id.* ¶ 7.)  After receiving his diagnosis, Plaintiff informed the

Middletown branch manager, Richard Robinson ("Robinson"), that he "suffered from a

disability" and that he "would eventually need to have [his] hip replaced."  (*See* Pl.'s Local Rule

56.1 Statement ("Pl.'s 56.1 Statement") ¶ 16 (Dkt. No. 63).)  He also submitted to Robinson a

doctor's note confirming this information, and he told Robinson at that time that "he was having

difficulty lifting things."  (*Id.*; *see also* Aff. of Gene Lewis ("Pl.'s Aff.") Ex. 1 (Dkt. No. 61)

(doctor's note describing Plaintiff's diagnosis, dated May 22, 2006).)  Robinson responded that

"he would 'put [the doctor's note] on file.'"  (*See* Pl.'s 56.1 Statement ¶ 16.)

"Almost immediately" after informing Robinson of his diagnosis, "Robinson's treatment

of Plaintiff changed for the worse."  (*Id.*)  Specifically, Robinson began "watch[ing] Plaintiff's

movements more vigilantly"; "call[ing] upon Plaintiff with even more frequency to do the order

picking from the warehouse, especially when it involved very heavy objects"; "requiring

Plaintiff to pick orders without regard to the weight limitations"; and "not allowing Plaintiff to

use the picker when picking orders in the warehouse," but instead "requir[ing] [Plaintiff] to use a hand truck." (*Id.* ¶ 12.)[1]  Robinson also began to make negative comments toward Plaintiff, many times in front of customers, telling Plaintiff that he was "slow," calling him a "gimp," and generally "communicat[ing] frustration . . . related to Plaintiff and his hip problems." (*Id.*)  Robinson also "repeatedly threatened" that he would fire Plaintiff if Plaintiff "was ever deemed less than '100%.'" (*Id.*)  In response, Plaintiff, fearful of losing his job, "did the best [he] could do to accomplish the tasks assigned to [him] and [he] tried to complain as little as possible," even though it was "painful" for him to do so and it possibly "made [his] condition worse." (Pl.'s Aff. ¶ 14.)

Experiencing "increasing pain and discomfort," and suffering from Robinson's "increasing" "mistreatment," Plaintiff saw an orthopedic surgeon in March 2008. (*See id.* ¶ 15.)  Thereafter, that doctor issued a "disability certificate," which placed a number of "restrictions" on Plaintiff's physical activity, including that he should "no[t] lift[] [anything] over 25 [pounds]," and that he should not engage in "prolonged standing or walking or climbing[.]" (Pl.'s Aff. Ex. 2, at unnumbered 2 (disability certificate, dated March 18, 2008).)  The certificate was "faxed directly to Robinson." (Pl.'s Aff. ¶ 15.)  Subsequently, Robinson appeared to be "extremely aggravated by the whole subject" of Plaintiff's disability, and he told Plaintiff "unequivocally . . . that [Ridgewood] does not allow workers who are not 100% and that if [Plaintiff] ever present[ed] as less than 100% physically able[,] or if [Plaintiff] [went] out on medical leave because of [his] disability[,] [he] better be 100% upon [his] return or [he] would lose [his] job." (*Id.* ¶ 16.)  Robinson also continued his general mistreatment of Plaintiff, acting

---

[1] A "picker" is a "machine[] . . . which would have enabled Plaintiff to perform [lifting] tasks using mechanical assistance." (Am. Compl. ¶ 33.)

"dismissive" of Plaintiff's disability, "yelling at [Plaintiff], calling [him] names[,] and insisting that [Plaintiff] continue to do the heavy lifting work." (*Id.* ¶¶ 17–18; *see also id.* ¶¶ 19–20 (alleging that Robinson continued to threaten to fire Plaintiff and that he continued to deny Plaintiff's requests to use the picker).)

In the fall of 2009, Plaintiff was transferred from the Middletown branch to a branch located in Newburgh, NY. (*See id.* ¶ 21.)  With Robinson remaining at the Middletown branch, Plaintiff was relieved that he "was no longer subject to Robinson's unrelenting ridicule and criticism[.]" (*Id.* ¶ 22.)  Moreover, although Plaintiff "was still called upon to perform tasks that required [him] to lift in excess of 25 pounds[,]" Plaintiff alleges that this happened "far less often" than at the Middletown branch, and that the Newburgh branch management made "at least some efforts . . . to provide the . . . accommodations" that his doctor had previously ordered. (*Id.*)  Specifically, Plaintiff "received help" with lifting tasks "each and every time he asked for [it]," and "when he could not do the task," the Newburgh branch management "understood, showed compassion[,] and assigned the task to someone else."  (Pl.'s 56.1 Statement ¶ 30.)

In 2010, Ridgewood filed for bankruptcy protection.  (*See* Defs.' 56.1 Statement ¶ 96.) Thereafter, a bankruptcy court issued an order allowing Ridgewood "to sell substantially all of its assets to Sovereign Bank, a secured party with loans" on which Ridgewood had defaulted. (Aff. of Diane C. Nardone in Supp. of Partial Summ. J. ("Nardone Aff.") ¶ 4 (Dkt. No. 51); *see also* Nardone Aff. Ex. K (bankruptcy court order, dated July 16, 2010).)  As part of the bankruptcy reorganization, Defendant Blackman Plumbing Supply, L.L.C. ("Blackman"), acting through two of its wholly owned subsidiaries (Defendant Orange County Plumbing Group, L.L.C. ("OCPG") and non-party New Jersey Plumbing Group, L.L.C. ("NJPG")), purchased many of Ridgewood's assets—such as facilities leases and customer data—from Sovereign

Bank.  (*See* Nardone Aff. ¶ 5; Defs.' 56.1 Statement ¶ 97; *see also* Nardone Aff. Ex. L ("Secured Party Sale and Disposition Agreement," entered into between OCPG, Sovereign Bank, and Ridgewood); Nardone Aff. Ex. M ("Bill of Sale," entered into between NJPG, Sovereign Bank, and Ridgewood).)

Blackman thereafter "took over operation of the [Ridgewood] stores," including the Newburgh branch.  (Pl.'s Aff. ¶ 23; *see also* Pl.'s 56.1 Statement ¶¶ 152–53 (alleging that "[t]here was no interruption in the operation of the business as it changed ownership to Defendants," and that "Defendants held themselves out as the successor to Ridgewood Corp.").)  Plaintiff remained employed at that branch, with "no break in service" resulting from the takeover.  (*See* Pl.'s Aff. ¶ 45 ("In July 2010 I had no break in service as it relates to my employment in the Newburgh Branch.  On July 18, 2010 I was employed by Ridgewood Corp. and the next day I was employed by [Blackman].").)  Blackman did, however, replace the Newburgh branch manager with Scott Brown ("Brown"), who gave Plaintiff "very good ratings" and recommended that Plaintiff receive a pay raise in a December 2010 performance evaluation. (*Id.* ¶¶ 23, 25.)[2]

In April 2011, Blackman told Plaintiff that it was closing the Newburgh branch and that it would transfer Plaintiff back to the Middletown branch, where Robinson remained the manager. (*See id.* ¶ 26.)  "Terrif[ied]" about the prospect of working under Robinson's supervision, and cognizant that his disability was "worsening[,]" (*id.* ¶ 27), Plaintiff called Fenton Harpster ("Harpster"), Blackman's Regional Sales Manager of the Southern Division, (*see* Defs.' 56.1 Statement ¶ 42), approximately "two weeks before [he] was supposed to start at Middletown[,]"

---

[2] Plaintiff alleges that he never received a pay raise subsequent to this evaluation.  (*See* Pl.'s Aff. ¶ 25.)

(Pl.'s Aff. ¶ 28).  Plaintiff told Harpster that he "was disabled because of [his] hip problems" and

that he "was worried about being back under Robinson's supervision" given Plaintiff's previous

experience with Robinson.  (*Id.*)  Harpster responded that "the transfer was still going to

happen," that Plaintiff "should address [his] concerns directly to Robinson," and that Harpster

"would not get involved until after [Plaintiff] had tried [a] direct approach with Robinson."  (*Id.*

¶ 29.)  Plaintiff, still "very worried about keeping [his] job[,]" "let the conversation with Harpster

end at that point and prepared [himself] to suffer through Robinson's supervision."  (*Id.* ¶ 30.)

Subsequent to Plaintiff's transfer, "Robinson's abusive behavior picked up where it left

off."  (*Id.* ¶ 32.)  Although Plaintiff "cannot recall" a time when Robinson "called [him] the

nickname 'gimp'" after Plaintiff returned to the Middletown branch as a Blackman employee, he

alleges that Robinson "did . . . all of the other things he had done to [Plaintiff] when [Plaintiff]

was previously under his supervision" as a Ridgewood employee, "including assigning [Plaintiff]

tasks that required lifting in excess of 25 pounds, demanding that [Plaintiff] proceed to the

warehouse and pick [up] orders even though there were [non-disabled] people . . . [available] to

do that work[,] and mocking and ridiculing [Plaintiff] because of [his] disability."  (*Id.*)  Plaintiff

specifically alleges that Robinson criticized him, sometimes in front of customers, for being slow

and clumsy, and that on multiple occasions Robinson "made reference to having a 'shovel' and

needing a 'bag of fertilizer,'" which Plaintiff describes as "a reference to [Plaintiff] being near

death and ready to be buried."  (*Id.* ¶ 33.)  Pursuant to Harpster's instructions, Plaintiff

"attempted to complain to Robinson about [his] behavior[,]" but Robinson "would not listen."

(*Id.* ¶ 34.)  Instead, Robinson told Plaintiff "that he did not care" and then "ordered [Plaintiff] to

go back to work."  (*Id.*)

On June 1, 2011, approximately eight weeks after Plaintiff was transferred to the Middletown branch, Plaintiff was terminated.  (*See id.* ¶ 40.)  Harpster arrived at the branch "late in the day . . . and proceeded directly to Robinson's office."  (*Id.*)  The two "met behind closed doors . . . for at least an hour[,] during which [Plaintiff] saw them talking and looking at things on the computer screen."  (*Id.*)  Harpster then left Robinson's office, "immediately came to [Plaintiff's] desk," "without hesitation said [to Plaintiff] 'it is not working out between you and Blackman,'" and "told [Plaintiff] that [he] was being let go."  (*Id.*)  Harpster then "instructed [Plaintiff] to leave immediately[.]"  (*Id.*)

Plaintiff alleges that Robinson was involved in the decision to terminate him and that he was fired "because of his disability."  (*Id.* ¶ 43; Pl.'s 56.1 Statement ¶¶ 78, 80, 84.)  At the time he was terminated, Harpster told Plaintiff that "it [was] not working out between [Plaintiff] and Blackman."  (Pl.'s Aff. ¶ 40.)  Shortly after Plaintiff was terminated, however, Robinson told another employee, Joan Kukelka ("Kukelka"), that he had "felt sorry for [Plaintiff] because he was hurting and he was sitting behind a desk and it was hard for him to move around, so [unemployment] was the best scenario."  (Decl. of Sanjay V. Nair ("Nair Decl.") Ex. G ("Kukelka Dep."), at 28–29 (Dkt. No. 50).)  Defendants have separately maintained that Plaintiff was laid off because the Middletown branch was losing money and Plaintiff had the lowest sales numbers in the branch.  (*See* Pl.'s 56.1 Statement ¶¶ 120, 122, 124.)  But Plaintiff alleges that his sales figures were the same as other employees who were not laid off at the time.  (*See* Nair Decl. Ex. B ("Robinson Dep."), at 88 ("Q.  And how was Gene doing relative to the other inside sales reps?  A.  Probably about the same as two others."); Aff. of Fenton Harpster in Supp. of Partial Summ. J. ("Harpster Aff.") ¶ 7 (Dkt. No. 68) (averring that Plaintiff's "sales numbers were unremarkable in that they were no different than two other inside salespersons at the time

. . . who, like [Plaintiff] also were not hitting their sales quotas").)  And he alleges that Robinson's discriminatory mistreatment purposefully and directly contributed to his low sales figures.  (*See* Pl.'s 56.1 Statement ¶ 72 (alleging that "Robinson took steps to purposefully interfere with Plaintiff's ability to perform his job duties successfully").)  Alternatively, Defendants maintain that Plaintiff was terminated because his skillset is "differe[nt]" and less "versatile[e]" than that of his co-workers.  (*Id.* ¶¶ 121, 123; *see also* Harpster Aff. ¶ 7 (averring that other employees with low sales numbers comparable to Plaintiff's "were capable of specialized sales and sales lead generation in . . . areas . . . [where Plaintiff] was not [as capable]").)

    No later than 90 days after Plaintiff was terminated, Harpster requested draft copy for a help-wanted advertisement for a position that was "precisely the same job that [Plaintiff had] held."  (*See* Pl.'s Aff. ¶ 49; Pl.'s 56.1 Statement ¶¶ 131–32 (alleging that "Harpster requested, reviewed and approved the publication of a help wanted advertisement for Plaintiff's position in the Middletown branch").)[3]  Defendants eventually hired Fred Krampath ("Krampath") to fill the position.  (*See* Pl.'s 56.1 Statement ¶ 146.)[4]  Krampath is not disabled, (*see* Robinson Dep. 101 ("Q.  Does [Krampath] have a disability?  A.  None that I'm aware of.")), and he was less qualified than Plaintiff, (*see* Decl. of Nathaniel K. Charny ("Charny Decl.") Ex. 5 (Krampath's résumé) (Dkt. No. 65) (indicating that Krampath had only five years of sales experience in

---

[3] Harpster disputes that he was attempting to fill Plaintiff's position.  (*See* Nair Decl. Ex. C ("Harpster Dep."), at 42 ("Q.  When you filled [Plaintiff's] position who did you fill it with, do you remember?  A.  I wouldn't say we filled [Plaintiff's] position.  I don't term it that."); Harpster Aff. ¶ 12 ("This job advertisement was not posted in contemplation of filling the position that [Plaintiff] previously vacated.").)

[4] All parties, in their briefing, refer to Fred's last name as Krampath.  However, his résumé indicates that his last name is actually Kamprath.  (*See* Charny Decl. Ex. 5 (Krampath's résumé).)  For the sake of consistency, the Court will also refer to his last name as Krampath.

Blackman's industry, and that Krampath had not worked in that industry for many years before he was hired); *see also* Pl.'s Aff. ¶ 52).

### B.  Procedural History

Plaintiff initially filed a lawsuit against Blackman, OCPG, Ridgewood, and Jules M. Weinstein ("Weinstein"), a principal officer of Ridgewood, in September 2011, alleging that those Parties violated federal and state labor laws by failing to pay Plaintiff minimum and overtime wages.  (*See* Compl. (Dkt. No. 1).)  Plaintiff then filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") in October 2011, (*see* Am. Compl. ¶ 49 (Dkt. No. 12)), and the EEOC issued a right-to-sue letter in mid-November, (*see id.* ¶ 51).  Thereafter, Plaintiff filed an amended complaint against the same four defendants, alleging the previous two labor-law causes of action and adding two new causes of action, one under the Americans with Disabilities Act ("ADA") and one under New York's Human Rights Law, alleging that Blackman and OCPG engaged in disability-based discrimination.  (*See* Am. Compl.)

The Parties completed discovery at the end of 2012.  (*See* Dkt. No. 25.)  In October 2013, Plaintiff and Weinstein informed the Court that they had reached a settlement agreement.  (*See* Dkt. No. 46.)  At those Parties' request, the Court later entered an order dismissing Plaintiff's claims against Weinstein with prejudice.  (*See* Dkt. No. 59 (entered November 12, 2013).)

Separately, and pursuant to a Motion Scheduling Order the Court adopted at a pre-motion conference held in June 2013, (*see* Dkt. No. 39), as modified by subsequent orders granting extension requests, (*see* Dkt. Nos. 42–44, 54, 58), Defendants Blackman and OCPG filed a Motion for Summary Judgment and accompanying Memorandum of Law in October 2013, (*see* Notice of Motion (Dkt. No. 47); Defs. Blackman Plumbing Supply, L.L.C. and Orange County

Plumbing Group, L.L.C.'s Mem. of Law in Supp. of Partial Summ. J. ("Defs.' Mem.") (Dkt. No. 52)).[5]  Plaintiff filed a Memorandum of Law in Opposition to Defendants' Motion in November 2013.  (*See* Pl.'s Mem. in Opp'n to Defs.' Mot. for Partial Summ. J. ("Pl.'s Mem.") (Dkt. No. 62).)  Defendants filed a Reply Memorandum in December 2013.  (*See* Defs. Blackman Plumbing Supply, L.L.C. and Orange County Plumbing Group, L.L.C.'s Reply Mem. of Law in Supp. of Partial Summ. J. ("Defs.' Reply") (Dkt. No. 66).)  Finally, with the Court's permission, (*see* Dkt. No. 70), Plaintiff filed a Sur-reply Memorandum shortly thereafter, (*see* Pl.'s Sur-reply Mem. in Opp'n to Defs.' Mot. for Partial Summ. J. ("Pl.'s Sur-reply") (Dkt. No. 72)).  The Court held oral argument on July 24, 2014.

## II.  Discussion

### A.  Legal Standard

Summary judgment shall be granted where the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dall. Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir. 2003); *see also Tufariello v. Long Island R.R. Co.,* 458 F.3d 80, 85 (2d Cir. 2006).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.,* 432 F.3d 428, 433 (2d Cir. 2005).

---

[5] Plaintiff's settlement agreement with Weinstein did not affect his claims against Ridgewood, and thus Ridgewood is still a defendant in this case.  However, Ridgewood did not join in Blackman's and OCPG's Motion.

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim[,]" in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (footnote omitted); *see also Wrobel v. Cnty. of Erie,* 692 F.3d 22, 30 (2d Cir. 2012) ("To survive a motion under Rule 56(c), [plaintiff] need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a genuine issue for trial." (emphasis and internal quotation marks omitted)). A fact is material when "it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted). Thus, a court's goal should be to "isolate and dispose of factually unsupported claims or defenses[.]" *Celotex,* 477 U.S. at 323–24.

B.  Analysis

Defendants move for summary judgment on certain aspects of Plaintiff's claims. First, Defendants move for summary judgment on Plaintiff's ADA claim and his related claim under New York Executive Law §§ 296 and 297, seeking a judgment that Plaintiff was not terminated because of his disability, that he was not denied a reasonable accommodation for his disability,

11

and that he was not subject to a hostile work environment.[6]  Second, Defendants move for summary judgment on Plaintiff's federal and state labor-law claims to the extent those claims allege successor liability for violations of those laws that occurred while Plaintiff worked for non-moving-defendant Ridgewood, seeking a judgment that Defendants are not successors-in-interest to Ridgewood.  The Court will address each argument in turn.

### 1.  Disability Claims

Plaintiff brings three claims related to his disability and Defendants' alleged mistreatment of Plaintiff while he was an employee at Blackman.  First, he alleges that Defendants "terminated [him] against his will, in a summary fashion and because of his disability and in retaliation for seeking to exercise his rights to reasonable accommodations under the ADA." (Am. Compl. ¶ 46.)  Second, he alleges that Defendants "failed to provide the reasonable accommodation required by [him] for his continued employment[.]"  (*Id.* ¶ 63.)  Third, he alleges that Defendants' "actions and inactions created a hostile work environment based on [his] disability and perceived disability."  (*Id.* ¶ 65.)  The Court will address each claim in turn.

### a.  Termination

Plaintiff first claims that Defendants terminated him because of his disability.  "Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting

---

[6] For purposes of resolving the instant Motion, the standard of liability under New York state law is the same as the ADA standard.  *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 99 (2d Cir. 2006) (noting that, in the context of a disability-discrimination claim, "[t]he standards for liability under [N.Y. Exec. Law § 296] are the same as those under the equivalent federal antidiscrimination laws"); *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004) ("New York state disability discrimination claims are governed by the same legal standards as federal ADA claims."); *Gill v. Maul*, 876 N.Y.S.2d 751, 753 (App. Div. 2009) (recognizing that "the ADA and Executive Law § 296 use the same legal standards to establish discrimination").  The Court therefore will not separately address Plaintiff's state-law claim.

analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, [411 U.S. 792 (1973)]." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (internal quotation marks omitted); *see also McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (applying *McDonnell Douglas* burden shifting to an ADA discrimination claim, whereby "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext" (internal quotation marks omitted)). [7]

---

[7] In his Memorandum, Plaintiff argues that the Court should apply a mixed-motive analysis to his claim, rather than the *McDonnell Douglas* burden-shifting framework, because he has presented "direct evidence of discrimination." (Pl.'s Mem. 2.) Under a mixed-motive analysis, "if the plaintiff establishes that a prohibited discriminatory factor played a 'motivating part' in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway." *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997). In certain cases, the Second Circuit has held that a mixed-motive analysis may be appropriate in the context of an ADA claim. *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 336–37 (2d Cir. 2000) ("agree[ing] with the analysis in . . . cases" from "a number of other circuits [which] have held the mixed-motive analysis available in the Title VII context applies equally to cases brought under the ADA"); *see also Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) ("[The plaintiff's] ADA claim could . . . succeed if she were able to show that discriminatory animus played a motivating role in [the defendant's] otherwise legitimate decision to alter her working conditions." (citing *Parker*, 204 F.3d at 337)); *Olson v. New York*, 315 F. App'x 361, 363 (2d Cir. 2009) (noting, in an ADA case, that the Second Circuit has "consistently held that a plaintiff in an employment discrimination case need not prove that discrimination was the sole motivating factor, the primary motivating factor, or the real motivating factor in the adverse employment action; she need only prove that discrimination was a motivating factor" (citing *Owen v. Thermatool Corp.*, 144 F.3d 137, 139 n.1 (2d Cir. 1998); *Renz v. Grey Adver. Inc.*, 135 F.3d 217, 222 (2d Cir. 1997); *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995))).

However, the Second Circuit has also recognized that "it is questionable whether [ADA] Title II discrimination claims can proceed on a mixed-motive theory after the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, [557 U.S. 167 (2009)], where the Court held that the [ADEA] does not authorize a mixed-motive age-discrimination claim." *Bolmer v. Oliveira*, 594 F.3d 134, 148 (2d Cir. 2010) (citing *Gross*, 557 U.S. at 175–76); *see also Lyman v. N.Y. & Presbyterian Hosp.*, No. 11-CV-3889, 2014 WL 3417394, at *10 (S.D.N.Y. July 14, 2014) (citing *Bolmer*, noting that "[s]ome district courts in [the Second] Circuit . . . have concluded that *Parker* cannot endure in light of *Gross*" while "[o]thers have preferred to treat

To make out the prima facie case for an ADA discrimination claim at the first step, a plaintiff must show that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *McMillan*, 711 F.3d at 125. (internal quotation marks omitted); *see also Glaser v. Gap Inc.*, 994 F. Supp. 2d 569, 572–73 (S.D.N.Y. 2014) (same).  Establishing the prima facie case "is not a demanding burden[,]" and, "[o]nce [the burden is] met, [the plaintiff] creates a presumption that the employer discriminated against the [plaintiff] in an unlawful manner." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998); *see also Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09-CV-1583, 2012 WL 1079943, at *14 (S.D.N.Y. Mar. 30, 2012) (same).

At the second step, "the defendant must produce evidence" which supports a "clear and specific" explanation for the termination, and which, "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (internal quotation marks omitted); *see also Avella v. Valley Cent. Sch. Dist.*, No. 09-CV-923, 2011 WL 6338805, at *7 (S.D.N.Y. Dec. 19, 2011) (same).  "If the defendant proffers such a reason, the presumption of discrimination drops out of the analysis, and the defendant will be entitled to summary judgment unless the plaintiff can

---

*Parker* as binding absent a conclusive pronouncement by the Second Circuit or the Supreme Court[] and have continued to apply mixed-motives analysis under the ADA[,]" and collecting cases).

Regardless of the appropriateness of applying a mixed-motive analysis to an ADA claim, the Court need not address this issue because it holds that Plaintiff has satisfied the more-stringent burden under the *McDonnell Douglas* framework.  *Cf. Berkowitz v. Cnty. of Orange*, 120 F. Supp. 2d 386, 400 (S.D.N.Y. 2000) (noting that "[a] plaintiff's burden of establishing a prima facie case is even greater under the mixed-motives approach than under *McDonnell Douglas*").

14

point to evidence that reasonably supports a finding of prohibited discrimination." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (alterations and internal quotation marks omitted).

Finally, at the third step, the plaintiff "must put forth adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's [disability] was the real reason for the discharge." *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996); *see also Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003) (holding that a plaintiff "must show, using evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason, that the defendant's proffered reason was pretextual" (citations and internal quotation marks omitted)). "The plaintiff retains the ultimate burden of persuasion," but "[s]ummary judgment is appropriate only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Kinsella*, 320 F.3d at 314 (alterations and internal quotation marks omitted).

Here, Plaintiff has made out a prima facie case. With regard to the only element in dispute—i.e., whether Plaintiff was terminated "because of his disability," *McMillan*, 711 F.3d at 125 (internal quotation marks omitted)—Plaintiff alleges that both Robinson and Harpster had notice of his disability, (*see* Pl.'s Aff. ¶ 15 (alleging that Plaintiff told Robinson about his disability in 2008); *id.* ¶ 28 (alleging that Plaintiff told Harpster about his disability in 2011)), that Robinson had previously made negative comments about his disability in relation to his work performance, (*see id.* ¶ 19 (alleging that Robinson told Plaintiff "that [Ridgewood] would not keep [Plaintiff] employed if [he] was not 100%"); *id.* ¶ 32 (alleging that "Robinson's abusive behavior [at Blackman] picked up where it left off [at Ridgewood]," and that, with the exception of calling Plaintiff a "gimp," Robinson "did . . . all of the other things he had done to [Plaintiff]

15

when [Plaintiff] was previously under his supervision" at Ridgewood)), that Harpster and Robinson spoke immediately before Harpster terminated him, (*see id.* ¶ 40 (alleging that, on the day of Plaintiff's termination, Harpster arrived at the Middletown branch "and proceeded directly to Robinson's office[,]" where the two "met behind closed doors . . . for at least an hour[,]" "during which [Plaintiff] saw them talking and looking at things on the computer screen[,]" and after which "Harpster left the meeting and immediately came to [his] desk and . . . without hesitation said 'it is not working out between you and Blackman' and . . . told [Plaintiff] that [he] was being let go")), and that Robinson later said that he was terminated because of his disability, (*see* Kukelka Dep. 28–29 (recalling that, days after Plaintiff was terminated, Robinson told her that "[h]e felt sorry for [Plaintiff] because he was hurting and he was sitting behind a desk and it was hard for him to move around, so [termination] was the best scenario")).  These allegations satisfy Plaintiff's "minimal" burden.  *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (describing a plaintiff's "'minimal' burden of setting out a *prima facie* discrimination case" under the *McDonnell Douglas* framework); *Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 245 (S.D.N.Y. 2014) (same); *see also Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) ("A plaintiff may rely on direct evidence of what the defendant did and said in satisfying her initial burden under *McDonnell Douglas*." (alterations and internal quotation marks omitted)).

Defendants respond that Plaintiff was terminated for legitimate reasons that had nothing to do with Plaintiff's disability.  They argue that Plaintiff was terminated because Blackman had "a need to reduce staff" due to "unprofitability," and because Plaintiff "had low sales numbers" and his "skill set differed from that of his other low-selling co-workers."  (Defs.' Mem. 13.)  They also argue that Harpster had no notice of Plaintiff's disability, and that Robinson—whom

they admit had such notice—played no part in the decision to terminate Plaintiff.  (*See id.* at 14

("Robinson . . . played no part in the decision to lay off Plaintiff. . . .  Harpster made that

decision without consulting Robinson, and Harpster was not knowledgeable about Plaintiff's

allegedly disabled status at the time he made the decision.  Robinson offered no opinion on the

termination.  Further, Harpster's decision was not built or founded on any negative review or

outlook on Plaintiff, as Harpster testified that he had never heard any negative aspect of

Plaintiff's job performance, excluding his knowledge of Plaintiff's poor sales numbers, which

had been discussed by Robinson and Harpster months before Plaintiff was laid off." (emphases

and citations omitted).)  This explanation is sufficient to support a nondiscriminatory reason for

Plaintiff's termination.  *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 469 (2d Cir.

2001) (holding that "economic concerns [can be] legitimate business reasons" for adverse

employment actions); *Robles v. Cox & Co.*, 987 F. Supp. 2d 199, 209 (E.D.N.Y. 2013) (finding

"legitimate non-discriminatory reasons" for termination where the plaintiff's "performance was

generally evaluated as average and she admitted at her deposition that she only had a narrow skill

set" compared to her coworkers); *Guzman v. News Corp.*, No. 09-CV-9323, 2013 WL 5807058,

at *21 (S.D.N.Y. Oct. 28, 2013) (holding that downsizing due to "unprofitability" is a

"legitimate, nondiscriminatory reason" for terminating an employee); *Delaney v. Bank of Am.

Corp.*, 908 F. Supp. 2d 498, 508 (S.D.N.Y. 2012) (holding that a defendant's explanation that the

plaintiff was terminated "because he was the lowest performing member" of his sales group and

"as part of a reduction in force" constituted a "legitimate, nondiscriminatory reason" for

termination); *Alam v. HSBC Bank USA, N.A.*, No. 07-CV-3540, 2009 WL 3096293, at *9

(S.D.N.Y. Sept. 28, 2009) ("A reduction in force may be a legitimate reason to dismiss

employees, as long as the company chooses which employees to dismiss on a non-discriminatory

basis."); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *3 (S.D.N.Y. Oct. 1, 2007) (holding that "downsizing" and poor job performance were "legitimate, nondiscriminatory reason[s] for terminating" employment).

In response, Plaintiff alleges that Harpster knew about his disability, (*see* Pl.'s Aff. ¶¶ 28, 44), that Robinson did participate in the termination decision, (*see* Pl.'s Mem. 12–14), that his sales numbers were no worse than several other employees whom Defendants did not terminate at that time, (*see id.* at 14–15), that Plaintiff had received positive performance reviews and had not been warned about poor performance, (*see id.* at 15–16, 20), that Defendants gave inconsistent explanations—one of which directly evidences discrimination, (*see* Kukelka Dep. 28–29)—for their termination decision, (*see* Pl.'s Mem. 7–9), and that Defendants replaced Plaintiff with a less experienced employee who was not disabled, (*see id.* at 17–18). Taken together, these allegations are sufficient to support a jury's finding that Defendants stated reasons for terminating Plaintiff were pretextual, and that Defendants terminated Plaintiff because he was disabled. *See Zann Kwan v. Andalex Grp. L.L.C.*, 737 F.3d 834, 846–47 (2d Cir. 2013) (holding that "shifting and somewhat inconsistent explanations" supporting a termination decision constituted "discrepancies" from which "a reasonable juror could infer that the explanations . . . were pretextual" (internal quotation marks omitted)); *Kinsella*, 320 F.3d at 314 (where the defendant claimed that the plaintiff was terminated as part of a legitimate reduction in force ("RIF"), the plaintiff's allegations that the supervisor negatively commented on the plaintiff's disability and that the company rehired terminated employees who were not disabled, and some of whom were less experienced than the plaintiff, "would permit a reasonable finder of fact to conclude that [the defendant] used the legitimate RIF as an opportunity to terminate [the plaintiff] because of his disability"); *Carlton*, 202 F.3d at 137 (holding that, where the plaintiff

"never received a negative written performance evaluation or formal warning," and where there was not "any writing whatsoever criticizing [the plaintiff's] job performance," the defendant's explanation that plaintiff was fired for "poor job performance" may have been an "afterthought"); *Walerstein v. RadioShack Corp.*, No. 04-CV-1096, 2007 WL 1041668, at *7 (E.D.N.Y. Mar. 30, 2007) (holding that the defendant's post-reduction-in-force decision to refill positions with "several non-disabled people" was "incompatible with [the defendant's] stated interest in reducing the staff at a store that was underperforming"); *see also Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir. 1998) ("[W]hile the facts that an employee's termination took place in the context of a reduction in force and that the employee was not replaced may well inform the general circumstances and hence may be considered by the jury when it weighs the submitted evidence, they rarely will be determinative at the summary judgment stage.").

In their Memoranda, Defendants dispute many of these allegations.  (*See* Defs.' Reply 4–8.)  However, it is not the Court's role, at summary judgment, to resolve these disputes.  *See Johnson v. IAC/Interactive Corp.*, — F. Supp. 2d —, 2014 WL 715666, at *7 (S.D.N.Y. Feb. 24, 2014) ("[I]n determining whether the articulated reason for the action is a pretext, a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable.  Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action." (internal quotation marks omitted)); *see also Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 326 (2d Cir. 2011) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists.").  And the disputes themselves argue against granting summary judgment. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) ("To avoid summary judgment in

an employment discrimination case, the plaintiff is not required to show that the employer's

proffered reasons were false or played no role in the employment decision, but only that they

were not the only reasons and that the prohibited factor was at least one of the motivating

factors." (internal quotation marks omitted)); *Baron v. Advanced Asset & Prop. Mgmt. Solutions,*

*L.L.C.*, — F. Supp. 2d —, 2014 WL 1679049, at *7 (E.D.N.Y. Apr. 29, 2014) ("An employment

discrimination claimant may show pretext by demonstrating such weaknesses, implausibilities,

inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could rationally find them unworthy of credence and

hence infer that the employer did not act for the asserted non-discriminatory reasons." (internal

quotation marks omitted)).  The Court thus denies Defendants' Motion for Summary Judgment

on Plaintiff's disability-discrimination claims.

### b.  Denial of Reasonable Accommodation

Plaintiff next alleges that Defendants violated the ADA when they denied him a

reasonable accommodation for his disability.  Like Plaintiff's termination claim, this claim is

also subject to the *McDonnell Douglas* three-step burden-shifting framework.  *See McMillan*,

711 F.3d at 125–26; *see also Snowden v. Trs. of Columbia Univ.*, No. 12-CV-3095, 2014 WL

1274514, at *4 (S.D.N.Y. Mar. 26, 2014); *Reyes v. Krasdale Foods, Inc.*, 945 F. Supp. 2d 486,

491 (S.D.N.Y. 2013).  To make out a *prima facie* failure-to-accommodate claim under the ADA,

a plaintiff must demonstrate that

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an
> employer covered by the statute had notice of his disability; (3) with reasonable
> accommodation, plaintiff could perform the essential functions of the job at issue;
> and (4) the employer has refused to make such accommodations.

*McMillan*, 711 F.3d at 125–26 (internal quotation marks omitted); *see also Golf v. N.Y.C. Dep't*

*of Fin.*, No. 13-CV-2865, 2014 WL 1651946, at *5 (S.D.N.Y. Apr. 23, 2014) (same).

Here, Defendants do not appear to dispute the first, third, or fourth elements.[8]  Instead, they argue that Plaintiff fails to demonstrate the second element—i.e., that he fails to show that he put Defendants on notice of his disability, and, relatedly, that he fails to show that Defendants had notice of his request for a reasonable accommodation related to his disability.  (*See* Defs.' Mem. 9.)

"It is . . . elemental that an employer could not have discriminated against a plaintiff *because of* [his] disability if it was unaware that the plaintiff was, in fact, disabled."  *Cozzi v. Great Neck Union Free Sch. Dist.*, No. 05-CV-1389, 2009 WL 2602462, at *14 (E.D.N.Y. Aug. 21, 2009); *cf. Williams v. N.Y.C. Hous. Auth.*, No. 07-CV-7587, 2009 WL 804137, at *7 (S.D.N.Y. Mar. 26, 2009) (finding, in the context of a public-housing claim, that "[w]ithout adequate knowledge" of the plaintiff's disability, the defendant "was not in a position to even offer, let alone refuse, a reasonable accommodation to [the] plaintiff" (internal quotation marks omitted)).  In a similar vein, a defendant "cannot be held liable for failing to provide reasonable accommodations when it had no actual or constructive knowledge of the need for any accommodations."  *MacEntee v. IBM (Int'l Bus. Machs.)*, 783 F. Supp. 2d 434, 444 (S.D.N.Y. 2011), *aff'd*, 471 F. App'x 49 (2d Cir. 2012).  To satisfy the notice requirement, a plaintiff must demonstrate that the defendant was aware that the plaintiff "was 'disabled' within the meaning of the ADA."  *Young. v. Ltd. Brands*, No. 11-CV-2927, 2013 WL 5434149, at *8 (S.D.N.Y. Sept. 25, 2013) (finding that the defendants "had no notice that [the] [p]laintiff had a disability" where

---

[8] To be clear, in their Memorandum, Defendants do argue that Plaintiff fails to demonstrate the fourth requirement.  (*See* Defs.' Mem. 9.)  However, it is clear from the phrasing of their specific contention and from the context of their overall argument that they dispute only whether Plaintiff gave them notice of his disability and his request for a reasonable accommodation.  (*See id.* (identifying the "central issues" as whether Defendants had notice of Plaintiff's disability and whether Defendants "refused to make [a reasonable] accommodation (when [they] had no such notice)").)

the defendants "were unaware that [the] [p]laintiff was 'disabled' within the meaning of the ADA, and did not consider her to be disabled"); *see also Moore v. Time Warner GRC 9*, 18 F. Supp. 2d 257, 262 (W.D.N.Y. 1998) (finding that the defendant did not have notice of the plaintiff's disability where "[m]ere knowledge that [the plaintiff] suffered from diabetes or hypertension [was] not equivalent to knowing that his condition 'disabled' him within the meaning of the ADA," and collecting cases); *cf. Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 370 (S.D.N.Y. 2007) (finding that a defendant, who allegedly discriminated against the plaintiff in the provision of public accommodations, had no notice of the plaintiff's disability where the plaintiff "never clearly informed [the defendant] that [the] plaintiff even had a disability nor requested any sort of accommodation").  Knowledge that a plaintiff has suffered an injury, by itself, is insufficient to satisfy the notice requirement.  *See McCoy v. Morningside at Home*, No. 11-CV-2575, 2014 WL 737364, at *4 (S.D.N.Y. Feb. 25, 2014) ("An employer's awareness that a plaintiff suffered some injury does not establish that an employer had notice that the plaintiff was disabled."); *Watson v. Arts & Entm't Television Network*, No. 04-CV-1932, 2008 WL 793596, at *14 (S.D.N.Y. Mar. 26, 2008) (finding "no evidence that [the] defendant had notice of the disability" where "[the] defendant had no reason to know or even suspect that [the plaintiff] suffered an impairment that was so serious that it rose to the level of a disability within the meaning of the ADA, notwithstanding [the] defendant's knowledge of [the] plaintiff's injury"), *aff'd*, 352 F. App'x 475 (2d Cir. 2009).

Plaintiff has identified a genuine dispute of material fact over whether Defendants had notice of his disability and his request for a reasonable accommodation.  Specifically, in an affidavit submitted with his Memorandum in Opposition to Defendants' Motion, Plaintiff alleges

that he notified Harpster of his situation shortly before he was transferred to Defendants'

Middletown branch:

> I called Fenton Harpster on the telephone about two weeks before I was supposed
> to start at Middletown and I told him that I was worried about being back under
> Robinson's supervision. I told Harpster that I was disabled because of my hip
> problems and that Robinson had made it impossible for me to work because of my
> disability and had refused to give me the accommodations that the doctor had
> ordered. I told Fenton that Robinson mocked and ridiculed me all the time about
> my disability, that he called me names such as "gimp" and "dumb ass," and that he
> had constantly criticized me for being too slow because of my disability.

(Pl.'s Aff. ¶ 28.) Plaintiff further alleges that Harpster declined to take any action in response to

Plaintiff's concern:

> Harpster responded that I should address these concerns directly to Robinson, that
> the transfer was still going to happen and that if issues came up again I should ask
> for a meeting with Robinson, "close the door" and raise my issues directly with
> Robinson. He told me that he would not get involved until after I had tried that
> direct approach with Robinson.

(*Id.* ¶ 29.) Feeling "surprised and disappointed by Harpster's response," Plaintiff "let the

conversation . . . end at that point and prepared [himself] to suffer through Robinson's

supervision." (*Id.* ¶ 30.)

Defendants' arguments in favor of summary judgment almost entirely ignore Plaintiff's

allegation that he directly informed Harpster of his disability and his need for a reasonable

accommodation. Instead, they rely on the assumption that Plaintiff bases his claim solely on the

allegation that Plaintiff informed Robinson of his disability prior to, but not during, Plaintiff's

employment at Blackman. In their framing of Plaintiff's claim, they acknowledge that "there

may be some factual disagreement as to whether [Robinson] was put on notice as to a medical

restriction preventing Plaintiff from lifting more than twenty-five pounds while he and Plaintiff

were employed with Ridgewood Plumbing[.]" (Defs.' Mem. 9.) However, they allege that

whatever notice Robinson had at Ridgewood did not transfer to Blackman. (*See id.* at 10

23

(alleging that, when Blackman purchased Ridgewood, "it extended new offers of employment to some former Ridgewood Corp. employees on a belief that the employees would be 'started from scratch' with Blackman Plumbing[,]" and that "Blackman Plumbing never reviewed any prior personnel files belonging to Ridgewood Corp with respect to Plaintiff"); *see also* Defs.' Reply 2–3 ("[I]t is undisputed that Blackman Plumbing did not review any 'personnel files' from Ridgewood Corp. that might have held the doctor's note on the basis that it wanted to start fresh with the former Ridgewood Corp. employees.").)  They further allege that Plaintiff did not make requests for reasonable accommodations while employed at Blackman, because he never objected to lifting for than 25 pounds, and he never requested use of the picker to help him retrieve orders.  (*See* Defs.' Mem. 9–10 ("Plaintiff states he did not object to lifting over twenty-five pounds while he was at the Newburgh location of Blackman Plumbing . . . .  Moreover, when Plaintiff was transferred back to the Middletown . . . location and once again worked for Robinson . . . , Plaintiff concedes he did not object to lifting more than twenty-five pounds as a Middletown Blackman Plumbing employee. . . .  [W]hile employed at the Middletown Blackman Plumbing location, Plaintiff states he did not even ask to use the mechanized 'picker' to assist in retrieving orders[.]" (emphasis omitted)); *see also* Defs.' Reply 2 (alleging that Plaintiff "did not object to carrying heavier items and did not actually ask to use the mechanized 'picker' to assist him in moving weighty items").)  Defendants thus contend that "it is clear [that Plaintiff] did not make Robinson, nor anyone else at Blackman Plumbing, aware of his alleged physical limitation when he was a[t] Blackman Plumbing."  (Defs.' Mem. 10.)

None of these allegations, however, addresses Plaintiff's allegation that he directly informed Harpster of his disability and his need for a reasonable accommodation.  Once Harpster was aware of Plaintiff's disability, Defendants had a duty to provide a reasonable

accommodation.  *See Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) ("[A]n employer has a duty reasonably to accommodate an employee's disability . . . if the employer knew or reasonably should have known that the employee was disabled."); *see also Miller v. McHugh*, 814 F. Supp. 2d 299, 312 (S.D.N.Y. 2011) ("[A]t times the employer is obligated to provide a reasonable accommodation when it perceives the employee to be disabled, whether or not the employee has asked for an accommodation." (internal quotation marks omitted)).[9]  This duty existed regardless of whether Plaintiff explicitly requested a reasonable accommodation. *See Brady*, 531 F.3d at 135–36 (holding that, once the defendant employer knew or reasonably should have known of the plaintiff employee's disability, the defendant "was obligated to engage in [an] interactive process" whereby the plaintiff and defendant "work[ed] together to assess whether [the] employee's disability [could] be reasonably accommodated" (internal quotation marks omitted)).  Moreover, in the context of Plaintiff's allegation that he informed Harpster of his difficult relationship with Robinson—and specifically the fact that Robinson "had made it impossible for [Plaintiff] to work because of [his] disability[,]" (Pl.'s Aff. ¶ 28)—there is a genuine dispute over whether Harpster's dismissal of Plaintiff's concerns—and his instruction to "raise [his] issues directly with Robinson[,]" (*id.* ¶ 29)—constituted a "breakdown" in the

---

[9] Although the Parties do not directly address this issue, the Court notes that Harpster's knowledge of Plaintiff's disability was sufficient to provide notice to Defendants for purposes of ADA liability.  *See Brady*, 531 F.3d at 134 (finding sufficient notice where record evidence demonstrated that a boss and a "store manager" perceived the plaintiff to be disabled); *see also Alexiadis v. N.Y. Coll. of Health Professions*, 891 F. Supp. 2d 418, 430 n.10 (E.D.N.Y. 2012) (denying a motion for summary judgment where the plaintiff alleged that his supervisors regarded him as disabled); *Davis v. Vt., Dep't of Corr.*, 868 F. Supp. 2d 313, 326–27 (D. Vt. 2012) (denying a motion to dismiss where the plaintiff alleged that his "supervisors and co-workers . . . regarded [him] as having a disability"); *Price v. City of New York*, 797 F. Supp. 2d 219, 232 (E.D.N.Y. 2011) (finding that the plaintiff alleged "that his employer had notice of his alleged disability" where the plaintiff alleged "that he notified both his supervisor . . . and his union representative . . . about his need for accommodation").

requisite interactive process that would make Defendants liable under the ADA.  *See Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 480 (S.D.N.Y. 2013) (noting that an employer is liable "for failure to provide a reasonable accommodation . . . when the employer is responsible for a breakdown in [the interactive] process" (internal quotation marks omitted)). Indeed, where Defendants argue that Plaintiff's failure to object to requests that he lift heavy objects undermines his claim, Plaintiff submits that this is proof that Harpster's response—i.e., that "he would not get involved until after [Plaintiff] had tried [a] direct approach with Robinson," (Pl.'s Aff. ¶ 29)—amounted to an unreasonable accommodation, or possibly even a rejection, of his request.  (*See id.* ¶ 30 ("I was surprised and disappointed by Harpster's response, but mostly I remained very worried about keeping my job so I let the conversation with Harpster end at that point and prepared myself to suffer through Robinson's supervision.").)  *Cf. Goonan*, 916 F. Supp. 2d at 483–84 (holding that a plaintiff stated a claim for failure to provide reasonable accommodations even though the employee refused to accept the employer's proposed accommodations because an employee is "not obliged to try [unreasonable accommodations]" before making more requests, and an employee may "refus[e] to continue a dialogue after speaking" with superiors who take an "uncompromising position").[10]

Defendants briefly address Plaintiff's allegation of his conversation with Harpster in a footnote in their Reply Memorandum.  They argue that Plaintiff alleges "only . . . that he told [Harpster that he] had doctor's orders in the past and [that he] seemingly regale[d] Harpster with

---

[10] The Court also notes that Defendants' arguments do not undermine Plaintiff's state-law claim, because under New York law, once an employer has knowledge of an employee's disability, "an employer's failure to engage in the interactive process is itself a violation of the law[,]" regardless of whether a reasonable accommodation even existed.  *Vangas v. Montefiore Med. Ctr.*, — F. Supp. 2d —, 2014 WL 1100153, at *16 (S.D.N.Y. Mar. 20, 2014) (collecting cases).

stories of the past." (Defs.' Reply 3 n.4) These allegations, Defendants argue, "do[] not state or otherwise suggest that [Plainiff] told Harpster that he was still under any doctor's weight restriction or required the same as a reasonable accommodation in his employment with Blackman Plumbing." (*Id.*) But Defendants mischaracterize Plaintiff's allegations. Although Defendants are correct that Plaintiff alleges that he told Harpster about Robinson's past conduct, Plaintiff's affidavit nevertheless creates a factual dispute over whether Plaintiff gave Harpster notice of an existing disability and of a renewed request for reasonable accommodation. Initially, Plaintiff alleges that he spoke to Harpster after he learned that he would be transferred to Middletown, a prospect that was "terrifying to [him]" given that his "disability was worsening[.]" (Pl.'s Aff. ¶ 27.) Plaintiff then specifically alleges that, when he spoke to Harpster, he told him that he "was worried about being back under Robinson's supervision" given that he "was disabled because of [his] hip problems[.]" (*Id.* ¶ 28.) And he alleges that, in that conversation, he referenced a previous request for accommodation and a doctor's note related to the same disability. (*Id.*) Moreover, Plaintiff separately alleges that this conversation put Harpster on notice of his disability and of his request for reasonable accommodation. (*See id.* ¶ 44 (alleging that "since 2011[,] Harpster knew of [his] disability and made no effort of any sort to engage in any meaningful interactive process regarding the accommodation of [his] disability").) The full context of Plaintiff's allegations thus makes clear that there is a genuine dispute over whether Defendants had notice.

Accordingly, because Plaintiff's allegations, taken as true, establish a prima facie case for a failure-to-accommodate claim, and because Defendants do not even attempt to meet their burden of demonstrating that they failed to accommodate Plaintiff's disability for a legitimate reason, the Court denies Defendants' Motion for Summary Judgment on this claim.

<u>c.  Hostile Work Environment</u>

Plaintiff finally claims that Defendants violated the ADA when they created a hostile

work environment for Plaintiff because of his disability.  As Defendants point out, the Second

Circuit has not yet decided whether the ADA comprehends a hostile-work-environment claim.

*See, e.g.*, *Adams v. Festival Fun Parks, L.L.C.*, 560 F. App'x 47, 51 n.4 (2d Cir. 2014) (noting

that "[s]everal . . . sister circuits have recognized a hostile work environment claim under the

ADA[,]" but that the Second Circuit "ha[s] not yet had occasion to consider [that] cause of

action"); *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 405

(S.D.N.Y. 2013) ("The Second Circuit Court of Appeals has not yet decided whether the ADA

provides a basis for a hostile work environment claim.").  However, district courts within the

Second Circuit have assumed, without deciding, that such a claim is cognizable.  *See, e.g.*, *Tse v.

N.Y. Univ.*, No. 10-CV-7207, 2013 WL 5288848, at *13 n.13 (S.D.N.Y. Sept. 19, 2013)

("Although the Second Circuit has not yet held that a hostile work environment claim is

actionable under the ADA, this Court assumes that Plaintiff can bring a hostile work

environment claim under the ADA."); *Ugactz v. United Parcel Serv., Inc.*, No. 10-CV-1247,

2013 WL 1232355, at *16 n.30 (E.D.N.Y. Mar. 26, 2013) ("The Court assumes without deciding

that Plaintiff can bring a hostile work environment claim under the ADA."); *Lewis v. Erie Cnty.

Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 347 n.3 (W.D.N.Y. 2012) ("For the purposes of this

motion, the court will assume that a hostile work environment claim is available under the ADA

and that the standards for a Title VII hostile work environment claim apply.").  This Court will

also assume that such a claim is cognizable.

To substantiate a hostile-work-environment claim, a plaintiff must allege facts

that would tend to show that the complained of conduct: (1) 'is objectively severe
or pervasive—that is, . . . creates an environment that a reasonable person would

28

find hostile or abusive;' (2) 'creates an environment that the plaintiff subjectively perceives as hostile or abusive;' and (3) 'creates such an environment because of the plaintiff's [disability].'

*Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088, 2014 WL 1259616, at *10 (S.D.N.Y. Mar. 24, 2014) (first alteration in original) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)); *see also Giambattista v. Am. Airlines, Inc.*, — F. Supp. 2d —, 2014 WL 1116894, at *8 (E.D.N.Y. Mar. 20, 2014) (same).  "Whether a workplace is a hostile work environment under the provisions of the ADA requires consideration of the totality of the circumstances[,]" including "'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance.'"  *Giambattista*, 2014 WL 1116894, at *8 (alterations in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *see also Rosario v. City of New York*, No. 11-CV-9008, 2013 WL 782408, at *8 (S.D.N.Y. Jan. 9, 2013) (same), *adopted by* 2013 WL 782581 (S.D.N.Y. Mar. 1, 2013).  However, the Second Circuit has recognized, in general, that hostile-work-environment claims frequently involve questions of fact that weigh against granting summary judgment on such claims.  *See Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012) (noting that "[t]he question of whether a work environment is *sufficiently* hostile to violate Title VII is one of fact[,]" and that "[t]he interpretation of ambiguous conduct is an issue for the jury" (internal quotation marks omitted) (first alteration in original)); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (noting that "hostile work environment claims present mixed questions of law and fact that are especially well-suited for jury determination[,]" and that "summary judgment is appropriate only where application of the law to those undisputed facts reasonably support only one ultimate conclusion" (alterations and internal quotation marks omitted)); *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) ("Where reasonable jurors could disagree as to whether alleged incidents

of . . . harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law."); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) ("Summary judgment is appropriate only if it can be concluded as a matter of law that no rational juror could view the defendant's conduct as an intolerable alteration of the plaintiff's working conditions." (alterations and internal quotation marks omitted)).

Here, Defendants appear to argue that Plaintiff has failed to show conduct that a jury could find to be "objectively severe or pervasive" and, in some cases, has failed to show that conduct was connected to Plaintiff's disability. Specifically, they argue that "Plaintiff's only acknowledgment of any name-calling by Robinson during [his] tenure at Blackman Plumbing consists of [a] reference to Robinson's calling of Plaintiff a 'dumb ass[,]'" which they argue "is an unserious insult that is not actionable[.]" (Defs.' Mem. 6.) They also acknowledge Plaintiff's allegation that Robinson mocked him as being "slow," but they argue that "Plaintiff . . . identified only a single instance during [his] time at Blackman Plumbing where he was criticized for being too 'slow[.]'" (*Id.* at 7 (emphasis omitted).) They also argue that neither of these alleged insults relate to Plaintiff's disability, (*id.* at 6–7), and they similarly argue that Plaintiff's identification of specific disagreements with Robinson and Robinson's general "harsh or 'nasty' disposition" do not demonstrate hostile treatment because of his disability, (*id.* at 7 ("Plaintiff only cites two actual disagreements between himself and [Robinson] while employed by Blackman Plumbing, and each of these incidents concerned Plaintiff's interaction with customers. . . . Robinson's supposedly harsh or 'nasty' disposition was universally felt by his employees and was not unique to Plaintiff . . . .")).

Plaintiff disputes Defendants' characterization of his allegations, and he submits other allegations of allegedly discriminatory treatment that Defendants do not directly address.  For example, Plaintiff makes a number of allegations that contradict Defendants' account of the severity, frequency, and causality of Robinson's alleged conduct:

> I remember several instances during [my employment at Blackman] that Robinson would be speaking to a customer and point out me walking around (slowly) and say things out loud for me and the customer to hear like: "look at him," mocking my clumsy walk.  Several times he made reference to having a "shovel" and needing a "bag of fertilizer," a reference to me being near death and ready to be buried.  He made this comment a few times during this eight week period.
>
> [A]fter a particularly mean-spirited mocking of me in front of a customer because I was walking slowly and with a pronounced limp, I asked him to stop making fun of me in front of people and to my face because it was wrong to talk to someone like that.  Robinson responded that he did not care and ordered me to go back to work.

(Pl.'s Aff. ¶¶ 33–34; *see also* Nair Decl. Ex. A ("Lewis Dep."), at 226 (alleging that Robinson "was just being nasty all the way around" while at Blackman).)  Moreover, while Defendants argue that Robinson's allegedly harsh treatment of Plaintiff was not connected to Plaintiff's disability, Plaintiff disputes that characterization.  (*See* Pl.'s Aff. ¶ 32 (alleging that Robinson "mock[ed] and ridicule[ed] [Plaintiff] because of [his] disability"); *id.* ¶ 39 (alleging that "Robinson took these actions because of [Plaintiff's] disability").)  Finally, even if Defendants are correct that many of Plaintiff's specific allegations related to Robinson's treatment of him involve conduct that occurred before Plaintiff's employment at Blackman, Plaintiff alleges that Robinson treated him in the same hostile manner while he was at Blackman.  (*See id.* ¶ 32 (alleging that while Plaintiff worked for Blackman, "Robinson's abusive behavior picked up where it left off[,]" and that "[w]hile [Plaintiff] cannot recall that [Robinson] actually called [him] the nickname 'gimp' during [his employment at Blackman], he did do all of the other things he had done to [Plaintiff] when [Plaintiff] was previously under his supervision").)

31

In response, Defendants argue that the Court should disregard Plaintiff's identification of these "several instances" of misconduct in his affidavit because they contradict his deposition testimony. (*See* Defs.' Reply 1.)  According to their account of the deposition, "when [Plaintiff was] asked if there were any . . . alleged abusive incidents with Robinson" other than a dispute Plaintiff had discussed regarding his timeliness in responding to a customer, Plaintiff "only identified one further incident in which Robinson complained about whether Plaintiff was selling a proper product to a customer." (*Id.*)  In their view, Plaintiff's failure to identify other incidents in response to that question directly contradicts his later identification of "several" incidents. But a review of the deposition transcript makes clear that Defendants' interpretation is incorrect. In fact, Plaintiff was not asked to list *all* incidents of discrimination, but was instead asked if "there [were] any other incidents." (Lewis Dep. 226.)  Plaintiff then responded by recounting one such incident—effectively answering the question in the affirmative—and then Defendants' counsel responded by asking a question that changed the subject. (*See id.* at 226–27 (responding to Defendants' question, "[w]ere there any other incidents with Rich Robinson" by recounting one incident, and then responding to Defendants' follow-up question, "[w]hen you went back to the Middletown office in 2011, were you required to lift anything in excess of 25 pounds[,]" in the affirmative).)  In other words, Plaintiff's affidavit is not inconsistent with his deposition testimony.

Moreover, in response to Plaintiff's allegation that Robinson taunted him with imagery of a "shovel" and a "bag of fertilizer," Defendants argue that "this [was] a tortured reference not logically related to the alleged disability concerning Plaintiff's hips[.]" (Defs.' Reply 2.)  They further argue that "if anything, [it] is nothing more than a mere offensive utterance which . . . cannot rise to the level of actionable conduct." (*Id.*)  However, as the Court has discussed,

whether conduct is "actionable" in the context of a hostile-work-environment claim is usually a question of fact best presented to a jury.  As the Second Circuit has emphasized in the context of a sexual-harassment hostile-work-environment claim, "[a]n Article III judge is not a hierophant of social graces and is generally in no better position than a jury to determine when conduct crosses the line between boorish and inappropriate behavior and actionable . . . harassment." *Schiano*, 445 F.3d at 605 (alterations and internal quotation marks omitted).  Here, as in other cases, the "haziness" of that line "counsels against summary judgment."  *Id.* (internal quotation marks omitted).  Thus, given this allegation and many others previously discussed, and assuming that a hostile-work-environment claim is cognizable under the ADA, Plaintiff has identified a genuine dispute over whether Defendants subjected him to a hostile work environment, and the Court denies Defendants' Motion for Summary Judgment on this claim.

2.  Labor-Law Claims

Defendants next seek summary judgment on Plaintiff's federal and state labor-law claims, which allege that certain Defendants "failed to pay . . . minimum wage, overtime and timely wages," in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and New York Labor Law.  (*See* Am. Compl. ¶¶ 53–59.)  Plaintiff appears to argue that his claims arise out of his employment at both Ridgewood and Blackman.  (*See* Defs.' Mem. 16 & n.3.)  In this Motion, Defendants seek summary judgment on Plaintiff's claims only to the extent that Plaintiff alleges that Blackman is indirectly liable for labor-law violations that occurred while Plaintiff was an employee at Ridgewood.  (*See id.*)  Accordingly, the Parties agree that, to win on this claim, Plaintiff must show that Blackman is a successor-in-interest to Ridgewood.  (*See* Defs.' Mem. 16; Pl.'s Mem. 21–25.)  *See also Battino v. Cornelia Fifth Ave., L.L.C.*, 861 F.

Supp. 2d 392, 400 (S.D.N.Y. 2012) (analyzing whether successor liability applied in the context of an FLSA claim).

"Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006); *see also In re Grumman Olson Indus., Inc.*, 467 B.R. 694, 700 (S.D.N.Y. 2012) (same).  Given that "[t]he Second Circuit has not delineated what the proper test for successor liability should be in the FLSA context[,]" courts have analyzed FLSA successor-liability claims under two commonly applied tests—namely, "the traditional common law test . . . applied in New York," and "the 'substantial continuity' test applied by federal courts in most labor and employment contexts." *Battino*, 861 F. Supp. 2d at 400; *see also Alvarez v. 40 Mulberry Rest., Inc.*, No. 11-CV-9107, 2012 WL 4639154, at *4 (S.D.N.Y. Oct. 3, 2012) (collecting cases where courts, both within the Second Circuit and in other circuits, have applied either the common-law test or the substantial-continuity test).  Because the Court finds that Defendants are entitled to summary judgment under either test, it need not determine which test applies.  *Cf. Alvarez*, 2012 WL 4639154, at *5 ("In this case, the Court need not choose between these two tests, because, under either test, there are disputed issues of fact, which, if resolved in plaintiff's favor, could support a finding of successor liability.").

### a.  Common-Law Test

Under the common-law test,

> a buyer of a corporation's assets will be liable as its successor if (1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction [was] entered into fraudulently to escape such obligations.

34

*Nat'l Serv. Indus.*, 460 F.3d at 209 (internal quotation marks omitted); *see also Recurrent Capital Bridge Fund I, L.L.C. v. ISR Sys. & Sensors Corp.*, 875 F. Supp. 2d 297, 306 (S.D.N.Y. 2012) (same).  Because neither Party argues that the first or fourth exception to the general rule against successor liability applies, resolution of Defendants' Motion requires only that the Court analyze the second and third exceptions, which, in cases like this one, "are so similar that they may be considered a single exception." *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n.3 (2d Cir. 2003); *see also Battino*, 861 F. Supp. 2d at 401 (same).

To impose successor liability under either the "de facto merger" or the "mere continuation" exception, a plaintiff must prove "continuity of ownership" between the predecessor and the successor corporations. *Battino*, 861 F. Supp. 2d at 401; *see also Priestley v. Headminder, Inc.*, 647 F.3d 497, 505 (2d Cir. 2011) (noting that "continuity of ownership is the essence of a merger, and the doctrine of *de facto* merger cannot apply in its absence" (citations and internal quotation marks omitted)); *Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998) ("Under the common law mere continuation theory, successor liability attaches when the plaintiff demonstrates the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations." (internal quotation marks omitted)).  Here, however, there is no continuity of ownership between Ridgewood and Blackman because it is undisputed that Blackman purchased certain of Ridgewood's assets in connection with a bankruptcy proceeding.  (*See* Defs.' 56.1 Statement ¶¶ 96–97 (alleging that Ridgewood filed for bankruptcy in 2010, that Ridgewood thereafter "turned over its assets to" Sovereign Bank after defaulting on its loans, that Blackman, "through its wholly-owned subsidiaries, purchased the facilities leases belonging to [Ridgewood] in a bankruptcy proceeding[,]" and that Blackman "made the purchase from Sovereign Bank,"

rather than from Ridgewood); Pl.'s 56.1 Statement ¶¶ 96–97 (admitting these allegations); *see also* Nardone Aff. ¶¶ 4–5 (affirming these allegations); Nardone Aff. Ex. K (bankruptcy court order approving sale of Ridgewood's assets to Sovereign Bank); Nardone Aff. Exs. L, M (contracts between Sovereign Bank, Ridgewood, and two of Blackman's wholly owned subsidiaries for the purchase from Sovereign Bank of certain of Ridgewood's assets—including property leases and various types of data).)  Thus, Plaintiff cannot prove successor liability under the common-law test.  *See Doktor v. Werner Co.*, 762 F. Supp. 2d 494, 499 (E.D.N.Y. 2011) ("Continuity of ownership exists where shareholders of the selling corporation become direct or indirect shareholders of the purchasing corporation.  Such common ownership does not exist where, as here, there is a sale of assets for cash."); *Desclafani v. Pave-Mark Corp.*, No. 07-CV-4639, 2008 WL 3914881, at *4 (S.D.N.Y. Aug. 22, 2008) (noting that "[n]umerous courts have held that [the continuity-of-ownership] factor is not satisfied where the assets are purchased solely with cash and, thus, none of the predecessor corporation's shareholders become shareholders of the successor corporation as a result of the asset purchase[,]" and collecting cases); *see also Nat'l Serv. Indus.*, 460 F.3d at 211 (noting that the continuity-of-ownership requirement "distinguishes an asset purchase from a de facto merger").  The Court would thus grant Defendants' Motion under the common-law test.  *Cf. Nat'l Serv. Indus.*, 460 F.3d at 215 (affirming summary judgment where the plaintiff "failed to point to any evidence of continuity of ownership and therefore . . . failed to raise an issue of fact that [the defendant] [was] liable as [a] corporate successor").

### b.  Substantial-Continuity Test

Under the substantial-continuity test, courts generally analyze nine factors:

(1) whether the successor company had notice of the charge or pending lawsuit prior to acquiring the business or assets of the predecessor; (2) the ability of the

predecessor to provide relief; (3) whether there has been a substantial continuity of business operations; (4) whether the new employer uses the same plant; (5) whether he uses the same or substantially the same work force; (6) whether he uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether he uses the same machinery, equipment, and methods of production; and (9) whether he produces the same product.

*Battino*, 861 F. Supp. 2d at 404 (internal quotation marks omitted).[11]  Of those factors, courts have recognized that at least the first factor ("notice" of the claim prior to acquisition) is "critical" to any finding of successor liability.  *See Musikiwamba v. ESSI, Inc.*, 760 F.2d 740 (7th Cir. 1985) ("The first two factors identified in *MacMillan* [of notice to the successor and ability of the predecessor to provide relief] are critical to the imposition of successor liability.

The successor doctrine is derived from equitable principles, and it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when . . . the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price."); *Rojas v. TK Commc'ns, Inc.*, 87 F.3d 745, 750 (5th Cir. 1996) ("This court agrees with *Musikiwamba* that the first two factors are critical."); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98-CV-8272, 2005 WL 22833, at *79 (S.D.N.Y. Jan. 5, 2005) ("To establish successor liability, two

---

[11] The *Battino* court applied the same nine-factor test that the Seventh Circuit applied in *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740 (7th Cir. 1985).  *See Battino*, 861 F. Supp. 2d at 404 (quoting *Musikiwamba*, 760 F.2d at 750).  The Seventh Circuit, in turn, based its test on the nine-factor test the Sixth Circuit applied in *E.E.O.C v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974).  *See MacMillan Bloedel Containers*, 503 F.2d at 1094 ("Courts that have considered the successorship question in a labor context have found a multiplicity of factors to be relevant.  The include: 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product.").

conditions must be satisfied: (1) the successor had notice of the claim before acquisition; (2) there was a substantial continuity in the operation of the business before and after the sale." (internal quotation marks omitted)); *see also Romita v. Anchor Tank Lines, L.L.C.*, No. 11-CV-9641, 2014 WL 1092867, at *4 (S.D.N.Y. Mar. 17, 2014) ("Under [the substantial-continuity] test, federal courts within the Second Circuit have found a successor liable where (1) it had notice of its predecessor's obligations and (2) a sufficient continuity of identity exists between the two businesses." (internal quotation marks omitted)).  Thus, Plaintiff has the burden of showing that Blackman had notice of his potential FLSA claim before the purchase of Ridgewood's assets.  *See Battino*, 861 F. Supp. 2d at 405 (noting that the plaintiffs "ha[d] the burden to show that [the defendant] had notice of [the plaintiff's] claim prior to the acquisition"); *Rowe Entm't*, 2005 WL 22833, at *79 (noting, in general, that plaintiffs "have the burden of affirmatively showing that" a defendant "had notice of the claims" (internal quotation marks omitted)); *E.E.O.C. v. Barney Skanska Constr. Co.*, No. 99-CV-2001, 2000 WL 1617008, at *3 (S.D.N.Y. Oct. 27, 2000) (same).

Plaintiff fails to meet this burden.  Although Blackman purchased Ridgewood's assets in 2010, (*see* Nardone Aff. ¶¶ 4–5; Am. Compl. ¶¶ 22–23), Plaintiff did not raise his FLSA claim in a lawsuit until he filed the instant Action in October 2011, (*see* Compl.), and he does not otherwise allege that he filed any formal complaints prior to the purchase.  Thus, to satisfy the notice element, Plaintiff must allege that Blackman had notice of a potential claim.  *See Battino*, 861 F. Supp. 2d at 405 (recognizing that, where a plaintiff cannot allege "notice of actual pending lawsuits," he may allege "notice of *potential* liability" (internal quotation marks omitted)).  Here, however, he has failed to identify any disputed material facts that would support a finding that Blackman had such notice.

Essentially, Plaintiff argues that Blackman knew about Plaintiff's potential claim because, "upon his employment by Defendants, Plaintiff's wage scheme was changed from Ridgewood's violative wage scheme of salary with no overtime, to a wage scheme based on hourly pay with at least some recognition of the applicability of overtime pay[.]" (Pl.'s Mem. 22.) He further argues that Blackman "made the change to Plaintiff's pay structure because [it was] cognizant of the legal perils" of not making the change given its contemporaneous experience with "investigations and findings of liability by both the federal Department of Labor and the New York State Department of Labor regarding the practice of not paying [its] Assistant Managers overtime [wages]." (*Id.* at 22–23.)[12] According to Plaintiff, the "wage orders" that resulted from the investigations "put Defendants on notice that Assistant Managers in the context of their business are . . . entitled to overtime" under the FLSA. (*Id.* at 23.) In other words, in the absence of evidence that Blackman had actual notice of Ridgewood's potential liability for Plaintiff's claim, Plaintiff appears to argue that Blackman had notice of such liability given its general familiarity with its obligations under federal and state labor laws.

Plaintiff's argument fails for multiple reasons. First, there is no evidence that Blackman knew or should have known that Ridgewood violated federal or state labor laws. With regard to the federal and state investigations, the documents Plaintiff submitted make clear that both investigations targeted Blackman; Ridgewood is not mentioned in any of the documents, and Plaintiff has not otherwise submitted any evidence that Ridgewood was subject to either a federal or a state investigation. (*See* Charny Decl. Ex. 8.) At best, therefore, this evidence demonstrates

---

[12] In support of this argument, Plaintiff has submitted documentation indicating that Blackman—but not Ridgewood—had been subject to federal and state investigations related to labor-law violations beginning as early as 2008 and continuing through at least 2011. (*See* Charny Decl. Ex. 8.)

that Blackman understood that employers in general are under an obligation to pay minimum and overtime wages under both federal and state labor laws, and that, by extension, Ridgewood had an obligation to pay these minimum and overtime wages. But even if Blackman knew that Ridgewood was under such an obligation, Plaintiff offers no evidence indicating that Blackman knew that Ridgewood had failed to comply with this obligation. None of the payroll records Plaintiff submitted indicating that Plaintiff may not have received overtime pay are from Ridgewood, and all of them cover periods post-dating Blackman's purchase of Ridgewood. (*See* Charny Decl. Ex. 7 (payroll records from OCPG covering a period that began, at the earliest, on July 19, 2010); *see also* Nardone Aff. Ex. K (bankruptcy court order approving Blackman's purchase of Ridgewood, dated July 16, 2010).) And although Plaintiff further argues that Blackman "changed . . . Ridgewood's violative wage scheme" "upon [Lewis's] employment by" Blackman, (Pl.'s Mem. 22), there is no evidence that Blackman made this change because of its knowledge of labor-law violations at Ridgewood, rather than as part of its effort to integrate Ridgewood's former employees into its pre-existing wage scheme, (*see* Defs.' 56.1 Statement ¶¶ 104–05 (alleging that Blackman made numerous changes to Ridgewood's operations when it took over, including "new computer systems, changes in inventory levels," "changing . . . all signs, literature, and billing from [Ridgewood's] name to [Blackman's] name[,]" and "payroll coming from Blackman"); Pl.'s 56.1 Statement ¶¶ 104–05 (not disputing that Blackman changed Ridgewood's payroll practices as part of the transition)). Indeed, there is no evidence that Blackman knew that its payroll system was *different* from Ridgewood's, and that it was therefore "chang[ing]" from one wage scheme to another, as Plaintiff asserts. (*See* Pl.'s Mem. 22.) Furthermore, because Blackman implemented the wage scheme after they completed the sale, even if Plaintiff's account were correct, this is not evidence that Blackman had notice of labor-

law violations before it purchased Ridgewood.  Therefore, Plaintiff has failed to create a genuine dispute over whether Blackman had notice of a potential claim against Ridgewood at the time it purchased Ridgewood's assets.  *See Rowe Entm't*, 2005 WL 22833, at \*79 (holding that the plaintiffs failed to demonstrate notice where they relied on "conclusory statement[s]" and argued "without any citation to evidence" that the successor company had notice of a claim); *cf. Battino*, 861 F. Supp. 2d at 407 (holding that "knowledge of the failure to pay [wages] alone is sufficient to put a successor on notice of potential liability" of an FLSA claim).

Second, in addition to failing to allege that Blackman knew of a potential claim, Plaintiff has failed to allege that Ridgewood knew of such a claim.  As discussed, none of the wage records or investigation records Plaintiff submitted concerned Ridgewood, and there is otherwise no evidence in the record that Ridgewood knew of any potential violations.  Plaintiff's counsel's contention at oral argument—that Blackman had notice of potential claims because Ridgewood's former owners held executive positions at Blackman—therefore fails to support his claim, because absent evidence that Ridgewood's owners knew of a potential claim, the record does not support the inference that Ridgewood's owners told Blackman of a potential claim.  Moreover, even if Ridgewood's owners did know of a potential claim, their post-sale employment at Blackman, standing alone, does not support the inference that Blackman knew of a potential claim *before* the sale.  *See Barney Skanska Constr.*, 2000 WL 1617008, at \*3 (finding no evidence of notice where an officer at the predecessor company became an officer at the successor company, because the record did not demonstrate that the officer had personal knowledge of the claim and the officer "did not become an employee of [the successor company] until *after*" the asset purchase agreement was completed); *cf. E.E.O.C. v. Nichols Gas & Oil, Inc.*, 518 F. Supp. 2d 505, 512 (W.D.N.Y. 2007) (finding notice where the predecessor

41

company's president "spoke directly" to the successor company "at the time of the sale" and

informed it of the claim).[13]  Therefore, Plaintiff has failed to create a genuine dispute over

whether Ridgewood told Blackman of potential violations before Blackman's purchase of

Ridgewood.  *Cf. Romita*, 2014 WL 1092867, at *5 (finding, at the motion-to-dismiss stage, that

"it [was] plausible that [the predecessor corporation's officers] informed [the successor

corporation] of the litigation before completion of the sale" (internal quotation marks omitted)).[14]

---

[13] In *Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168 (1973), the Supreme Court
upheld a lower court's finding that a successor company "purchased [a] business with knowledge
of . . . unfair labor practice litigation" where a manager from the predecessor company
"continued with the enterprise under [the successor company's] ownership with the title of
general manager and 'president[,]'" and where there was evidence "sufficiently substantial to
support an inference that [the manager] informed his prospective employer of the litigation
before completion of the sale." *Id.* at 173.  In that case, however, there was evidence that the
manager knew of actual, pending litigation—including evidence that the manager "had
authorized payment of substantial fees in connection with" the litigation.  *Id.* at 174; *see also
Romita*, 2014 WL 1092867, at *5 & n.5 (finding plausible the plaintiffs' allegations, at the
motion-to-dismiss stage, that a principal owner and president of a predecessor company who was
hired by a successor company informed the successor company of a claim, but only where the
predecessor company faced actual litigation, including a default judgment).  Here, by contrast,
there is no evidence in the record that the Ridgewood executives knew of an actual or
potential claim.

[14] At oral argument, Plaintiff's counsel argued that the Court should deny summary
judgment for the same reasons the court expressed in *R.C.M. Exec. Gallery Corp. v. Rols Capital
Co.*, 901 F. Supp. 630 (S.D.N.Y. 1995).  In that case, as relevant here, the court denied summary
judgment on "[t]he issue of whether [a partner at the predecessor company] knew about any
alleged wrongdoing by [the company]" because it found that that issue "involve[d] numerous
questions of fact" and therefore "[could not] be resolved in the context of a motion for summary
judgment."  *Id.* at 636; *see also Abdel-Khalek v. Ernst & Young, L.L.P.*, No. 97-CV-4514, 1999
WL 190790, at *7 (S.D.N.Y. Apr. 7, 1999) (denying a motion for summary judgment where
"there [was] an issue of fact about whether the defendant had notice of the plaintiff's"
discrimination claim because the plaintiff alleged that she had notified a partner at the successor
company of potentially actionable conduct at the predecessor company).  Here, however,
although Plaintiff argues that Blackman had notice, he does not identify a genuine dispute over a
material fact that would support the inference that Blackman had notice.  Summary judgment is
therefore proper, notwithstanding the court's holding in *Rols Capital*.

Third, given the lack of evidence indicating that Defendants were or should have been aware of Plaintiff's potential claim, the Court notes that Defendants' purchase of Ridgewood's assets as part of a bankruptcy proceeding argues, in general, against a finding that Blackman had notice of the potential claim given the equitable interests uniquely present in the bankruptcy context.  *See, e.g.*, *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 50–51 (7th Cir. 1995) (rejecting a per se rule barring successor liability in bankruptcy transactions, but recognizing that such liability may have a "chilling effect" on bankruptcy transactions unless "purchasers can demand a lower price to account for pending liabilities of which they are aware" or "federal successorship principles" eliminate responsibility "for liability of which [the purchasers] had no notice"); *Steinbach v. Hubbard*, 51 F.3d 843, 847 (9th Cir. 1995) (declining to impose successor liability where time pressures associated with a pending bankruptcy undermined the "principle reason for the notice requirement" (i.e., that the successor would have "an opportunity to protect against liability by negotiating a lower price or indemnity clause"), and where imposing liability would adversely implicate "the interests of the affected parties, as well as the policies underlying FLSA and supporting free transfer of capital"); *see also, e.g.*, *Douglas v. Stamco*, 363 F. App'x 100, 102–03 (2d Cir. 2010) (noting that "underlying public policy concerns" weighed against imposing successor liability in a bankruptcy transaction where imposing such liability "would be inconsistent with the Bankruptcy Code's priority scheme because [the] claim [would] otherwise [be] a low-priority, unsecured claim[,]" and where "the potential chilling effect of allowing a . . .

claim subsequent to the sale would run counter to a core aim of the Bankruptcy Code, which is to maximize the value of the assets and thereby maximize potential recovery to the creditors").[15]

Accordingly, the Court holds that, under either successor-liability test, Plaintiff has failed to identify a genuine dispute of material fact in the context of his labor-law claims to the extent that Plaintiff seeks to impose liability on Defendants Blackman and OCPG for Ridgewood's alleged labor-law violations.  The Court therefore grants Defendants' Motion for summary judgment on Plaintiff's labor-law claims.

---

[15] Aside from these general concerns weighing against a finding of successor liability in the bankruptcy context, courts also recognize that, "[w]here the successor corporation purchases the assets of a bankrupt entity, it is appropriate to look to the relevant purchase documents, and to consider the policies of the bankruptcy laws when determining the successor liability issue." *Doktor*, 762 F. Supp. 2d at 498.  "An asset purchase agreement that specifically negates facts that might otherwise support successor liability is entitled to enforcement."  *Id.*  More specifically, under certain provisions of the Bankruptcy Code, "[a] bankruptcy court's order approving the sale of assets serves to enjoin existing claimants' successor liability claims against the purchaser[.]"  *Lyons v. Rienzi & Sons, Inc.*, 863 F. Supp. 2d 213, 223 (E.D.N.Y. 2012), *on reconsideration in part*, No. 09-CV-4253, 2012 WL 1339442 (E.D.N.Y. Apr. 17, 2012) (internal quotation marks omitted); *see also In re Smart World Techs., L.L.C.*, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 [of the Bankruptcy Code] permits sales of assets free and clear of claims and interests.  It thus allows purchasers . . . to acquire assets without any accompanying liabilities." (citation omitted) (citing 11 U.S.C. § 363(f))); *In re Grumman Olson Indus.*, 467 B.R. at 703 ("Section 363(f) can be used to sell property free and clear of claims that could otherwise be assertable against the buyer of the assets under the common law doctrine of successor liability." (internal quotation marks omitted)).

Here, the bankruptcy court order approving the sale of Ridgewood's assets to Sovereign Bank specified that the sales were "free and clear of all liens, claims and encumbrances[.]" (Nardone Aff. Ex. K, at 7.)  Moreover, the subsequent "Secured Party Sale and Disposition Agreement" between Sovereign Bank and Blackman specified that Blackman "shall not assume or otherwise be liable in respect of, or be deemed to have assumed or otherwise be liable in respect of, any debt, claim, credit, obligation or other liability of [Ridgewood] including . . . any litigation[.]"  (Nardone Aff. Ex. L, at 6.)  Without deciding whether the bankruptcy court's order and the sale contract are sufficient, by themselves, to absolve Blackman of successor liability, the Court notes that these documents weigh against a finding that Blackman had notice of Plaintiff's potential claim, especially where Plaintiff has been unable to provide evidence that either Blackman or Ridgewood had notice of the potential claim before the asset purchase.

### III.  Conclusion

In light of the foregoing, the Court grants Defendants' Motion in part and denies it in part.  Specifically, it grants Defendants' Motion for Summary Judgment on Plaintiff's labor-law claims, and it thereby dismisses that claim as alleged against Defendants Blackman and OCPG for any labor-law violations that occurred while Plaintiff was employed at Ridgewood.[16] However, the Court denies Defendants' Motion for Summary Judgment on Plaintiff's federal and state disability-discrimination claims.  The Clerk of Court is respectfully requested to terminate the pending Motion.  (*See* Dkt. No. 47.)

SO ORDERED.
Dated:          September 29, 2014
                White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[16] In their Memorandum, Defendants clarified that they are "not moving as against direct claims made against [them] for unpaid wages and hours, and [in their Motion] only address[] those indirect claims [they are] allegedly subject to as a supposed successor to [Ridgewood]." (Defs.' Mem. 16 n.3.)  The scope of this Order is thus so limited.